Nashville Gas & Heating Co. *v.* City of Nashville *et al.*

(*Nashville,* December Term, 1940.)

Opinion filed June 14, 1941.

PRICE, BARKSDALE & PRICE and NORVELL & MINICK, all of Nashville, for Nashville Gas & Heating Co.

BASS, BERRY & SIMS, W. C. CHERRY, E. C. YOKLEY, JR., and CHARLES G. BLACKARD, all of Nashville, for City of Nashville.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

In 1911 the City of Nashville, pursuant to charter powers, granted authority to the Gas Company, complainant below, by ordinance formally accepted, to "construct, acquire, maintain and operate gas works in the city of Nashville, county of Davidson, State of Tennessee, and to manufacture, sell and supply gas in said city, and to buy, use and maintain pipes and extend existing conduits and mains, with all the necessary and proper attachments, connections and appurtenances below the surface of the streets, avenues, sidewalks, alleys and public grounds, and on the bridges and viaducts of the city of Nashville, as the boundaries thereof are now and may thereafter be, for the supply and distribution of gas, and for the same purpose to erect and maintain therein all necessary posts for lamps and lanterns, and to make connections for customers with such pipes and mains, for the term of forty years," subject to specified conditions as to the making of excavations, laying of pipes, etc., in

the streets, alleys, and sidewalks, for the preservation thereof and the protection of the public. Provisions were also made concerning the quality and quantity of gas to be furnished the City and the public and the rates to be charged for such service.

By Section 12 of the ordinance it was provided, "That in event a majority of the qualified voters of the city voting on the proposition herein directed to be submitted, shall vote for the adoption of this ordinance, then the Nashville Gas & Heating Company, in consideration of the rights and licenses hereby granted to said company, shall pay to the Mayor and City Council of Nashville the full sum of one hundred thousand ($100,000) Dollars, and said payment shall be made by said Nashville Gas & Heating Company within ten days after said election, and it shall not exercise any of the licenses and privileges hereby granted until said payment shall have been made. Provided, that nothing in this ordinance shall be construed as exempting said Nashville Gas & Heating Company from the payment of any taxes lawfully imposed by the Mayor and City Council of Nashville."

Also, directly pertinent here, by Section 14 it was provided: "That in consideration of the rights and licenses hereby granted to the Nashville Gas & Heating Company, and in addition to the payment required to be made as hereinbefore provided in Section 12, said company shall pay to the Mayor and City Council of Nashville five (5) per centum of its gross receipts from the sale of gas, and also from the sale, at a fair market value, of by-products, unless and until said Mayor and City Council of Nashville—and the voters of the city at an election held for such purpose, according to the provisions of the law, shall ratify such, grant a license or

right to any other company to engage in the same or a similar business to that of the Nashville Gas & Heating Company, and such other companies shall actually engage in business or the city itself engage in such business at which time all payments provided for in this section shall cease; Provided, that nothing herein contained shall be construed to prevent the city from granting a license or right to a natural gas company. . . . . ''

Invoking application of a clause contained in Section 31, Chapter 21, of the Act of 1939, amending the general revenue act, Chapter 192 of 1937, the Gas Company filed this bill under the Declaratory Judgment Law seeking a declaration and decree that, ''by virtue of the statutes of the State of Tennessee, and particularly by virtue of the enactment of Section 31 of Chapter 21 of the Public Acts of 1939, it is relieved of the obligation of paying, and is not obligated further to pay, five per cent of its gross receipts, as specified in Section 14 of the aforesaid franchise ordinance of the City of Nashville, approved October 10, 1911, it having made such payment for the period prior to the time of the enactment of Chapter 21 of the Public Acts of 1939;'' and praying also for an injunction restraining the City from enforcing further payments of the 5 per cent. gross receipts under the contract hereinbefore described.

The determinative question, as we conceive it, is whether or not this clause of the general revenue act invoked by the Gas Company shall be construed as expressing the intention of the Legislature to abrogate this contract and deprive the City of Nashville of the compensation therein provided to be paid by the Gas Company for the rights granted and enjoyed.

The brief for the Gas Company thus concisely states

the issues presented to this court, raised by demurrer of the City:

"1. Has the Legislature the power to relieve appellee, Nashville Gas & Heating Company, from the payment of five per cent of its gross receipts, as provided in Section 14 of the Nashville 'Gas Franchise Ordinance'?

"2. Did the Legislature, by the passage of Chapter 21, Public Acts 1939, with Section 31 therein, intend and undertake to relieve appellee from the further payment thereof?

"3. Does said Act of 1939 violate Article II, Section 17 of the Constitution of Tennessee?"

The chancellor overruled the demurrer of the City raising these questions, and the City has appealed.

In arriving at the meaning to be given to the language relied on by the Gas Company, it is helpful to look not only to the language contained in Section 31 of Chapter 21, Acts of 1939, and its context in this section, but to the history and setting of this amendatory clause and its position as a part of the general revenue laws of the State.

Chapter 108 and the amendatory Chapter 192 of the Acts of 1937 "provide for general revenue for the State of Tennessee, and the counties and municipalities thereof," as the title recites. Item G of Chapter 108 fixes a privilege tax of 3 per cent on gross receipts of gas, water electric dealers and distributors; Chapter 192, passed at the same legislative session, reduced this tax to $1\frac{1}{2}$ per cent on gas companies. This Item G of the revenue bill provided that, "This tax shall not apply to cities or other political subdivisions of the State owning and operating gas companies," etc.; that, "It is the intention of this Item to levy a tax for the privilege of engaging in intrastate commerce," etc.; that, "There shall be

credited upon the tax hereby imposed any taxes paid under the Franchise Tax Law and under the Excise Tax Law during the calendar year,'' etc.; and that, ''The tax hereby imposed shall be administered and collected in accordance with Article III, Section 2 of this Act,'' which applies to all privilege taxes fixed on the gross receipt basis, such as soft drink bottlers and manufacturers, telephone and telegraph companies and other public utilities. It is of interest, in this connection, to observe that Section 2 of Article II of this revenue act, in which section appears Item G imposing the tax on gas companies, provides that ''the tax herein stated'' is for State purposes only and that, ''no county or municipality may impose any tax upon the privileges mentioned in this section,'' etc. (That the subject of this legislation is a *tax* is thus emphasized by repeated recitation.) It thus appears that if the contractual payment of the Gas Company to the City of Nashville was or is a ''tax'' within the class dealt with in the revenue act, then its collection was prohibited by the express terms of this section of the act itself. We think it quite obvious from the foregoing review that the legislative provisions in the general revenue act of 1937, imposing a *tax* on the gross receipts of gas and other utilities, had no intended reference or application to this special contractual obligation based on gross receipts of the Nashille Gas & Heating Company.

Now it was this State and County general tax law which was amended by Section 31 of Chapter 21 of the Acts of 1939, by adding to Item G, ''to be a part of said paragraph the following:''

''Any person, firm or corporation engaged in the business of manufacturing gas or of distributing manufactured gas that is now required by municipal ordinance or franchise to pay a gross receipts, privilege, franchise

or license tax to any municipality or county in Tennessee shall not be entitled to said reduction of one and one-half (1½%) per cent, but shall be required to pay an amount equal to three (3%) per cent of the gross receipts derived from intrastate business in this State, and by reason of said requirement any such person, firm or corporation shall be and is hereby relieved from paying any such gross receipts, privilege, franchise or license tax to any municipality or county in Tennessee.''

We have seen that the act before amended had no application to a contract for compensation such as we are considering, that it was clearly dealing with a different type of charge against the gross receipts of gas and other utilities, a privilege *tax* in the strict sense, for State revenue purposes. Is this amendment to be construed as radically departing from this classification and so enlarging the scope of the subject of the legislation as to abrogate this contract?

It has been seen that Item G, which exacts payment of this percentage of gross receipts, expressly and repeatedly refers to the charges as a "tax," a privilege tax, and such it is. The revenue act levies privilege, license, and frachise taxes, all in the exercise of governmental taxing power. The subject dealt with in the above-quoted amendment of 1939 is likewise described as a "tax," privilege, franchise, license "tax."

If it was the intention of the Legislature to refer to this special contractual obligation, created by voluntary agreement, not by the exercise of any governmental power, a charge intrinsically different as to origin, foundation and purpose from that imposed by the act, it would seem that more apt words would have been employed. Especially is this so in view of the fact that this court had had this contract under consideration comparatively

recently and distinguished this character of obligation under this identical contract from a tax. *Lewis v. Nashville Gas & Heating Co.,* 162 Tenn., 268, 40 S. W. (2d), 409. Learned counsel concede that "the requirement of the payment by appellee of five per cent of its gross receipts was not exacted by the City in the exercise of the taxing power, but as a payment prescribed or exacted under a contract for the exercise of its franchise or license for the use of the streets, etc., of appellant, and, therefore, is not a 'tax,' in the primary or more restricted technical sense in which that word is used in legal nomenclature." They say further, "This requirement of payment by appellee of five per cent of its gross receipts is a gross receipts tax, or franchise tax, and/or license tax, in the *secondary use or meaning* of the word tax." (Italics ours.)

We think a distinction of importance is here conceded. To adopt and apply a "secondary" meaning here, would require, (1) a departure from the sense in which the word is used in the act amended by the addition of this clause, (2) a holding which would abrogate a voluntary contract for compensation of long standing, approved by judicial decision, in exercise of a power which, if conceded to the Legislature, will not be lightly presumed to have been intended to be exercised, and (3) a drastic reduction in the total gross receipts charge of $6\frac{1}{2}$ per cent. theretofore exacted of the Gas Company ($1\frac{1}{2}$ to the State and 5 per cent. to the City) to but 3 per cent.

This court has refused to apply such a "secondary" meaning of the term "tax," when it appears in general statutes. For example, in *Knoxville v. Lee,* 159 Tenn., 619, 21 S. W. (2d), 628, we held that special assessments on abutting property were not within the term "taxes,"—*ad valorem,* privilege or poll—as used in

the six-year limitation of the Act of 1885 and "to regulate the time of the collection of taxes." And in the recent case of *Obion County, for Use, etc.,* v. *Massengill et al.,* 177 Tenn., 477, 151 S. W. (2d), 156, decided at Jackson May 24th, 1941, we refused to extend the meaning of the term "taxes" as used in Code Sections 1601, 1678, 1679, providing for references for taxes when court sales of land are made, to drainage taxes, holding that such "taxes" were taxes in a special and limited sense only; and they, too, are within the "secondary" meaning of the term. These holdings have application by analogy. Upon the principle of construction followed therein, and in cases cited in the opinions, it would seem that when the term "tax" is employed in our general revenue act the meaning should not be extended to embrace a contract for compensation, such as we have here, even though it be conceded that the term "tax" has a "secondary" meaning within which such a contract might be embraced. Since this court had thus distinguished such a charge from a "tax," the deduction is reasonable that if the Legislature had intended, in thus amending the general revenue act, to refer to and abrogate this contract it would have used language more appropriate to this end.

Considering further *Lewis* v. *Nashville Gas & Heating Co., supra,* [162 Tenn., 268, 40 S. W. (2d) 412], we held in that case that this annual charge on gross receipts was not one imposed by the City in the exercise of either governmental power to tax, or police power to regulate; that the City thus "obtained money which it could use as revenue does not determine the character of the charge, or make it a tax," as contended in that case. This was the predicate of the attack made in that case on this contract. Further distinguishing this obligation from a tax, this court said:

"The city was authorized by statute to prescribe the terms and conditions upon which the gas company might enter and establish its business. That, it appears, was done through negotiations with the gas company, and the obligation, voluntarily assumed by it, was not the result of the exercise of a governmental power, but of a contract which both parties could make (*City of Lancaster* v. *Briggs,* 118 Mo. App. 570, 96 S. W., 314), and the annual payments prescribed by section 14 of the ordinance were compensation to be paid the city for the exercise of the franchise, conditionally granted by the State, subject to assent of the city as proprietor of its streets. Among others, this proposition is well supported by the following authorities: *Hanford Gas [& Power] Co.* v. *City [of Hanford]*, 163 Cal., 108, 124 P., 727; *Byrne* v. *Chicago Gen. Ry. Co.,* 169 Ill., 75, 48 N. E., 703; *Allegheny City* v. *Millville, E. & S. St. Railway [Co.],* 159 Pa., 411, 28 A., 202; *City of Mitchell* v. *Dakota [Cent.] Telephone Co.,* 25 S. D., 409, 127 N. W., 582; *Jamestown* v. *Home Telephone Co.,* 125 App. Div. 1, 109 N. Y. S., 297; *Portsmouth* v. *Virginia Railway [& Power],* 141 Va., 54, 126 S. E., 362, 39 A. L. R., 1510. See, also, 19 R. C. L., p. 1153, sec. 427, where it is said:

" 'One of the conditions which a municipal corporation can lawfully attach to the grant of a franchise is the payment of money; and the payment need not be such as is imposed upon all others similarly situated, as in the case of a tax, or the equivalent of the cost of inspection and replacement, as in the case of a license fee imposed under the police power, but may be a definite sum arbitrarily selected, and if the company does not wish to pay it it need not accept the franchise.' "

Now, looking again to the language of the amendment to the general revenue law, imposing taxes under govern-

mental power, on which the Gas Company herein relies, it is seen that the subject dealt with is described as a "privilege, franchise or license tax;" it is this tax to which this amendment is directed and relieves against. Since, as has been shown, this voluntary, contractual charge, by way of compensation, has been declared by this court not to be a "tax," why is it incumbent on this court to enforce upon the City a construction that brings it within the terms, or intention of this exempting act, and abrogate this contract?

Learned counsel argue, first, as hereinbefore mentioned, that we should go beyond the admittedly "primary" meaning of the language and adopt what is described as a "secondary" meaning, sometimes given the term tax. Commenting on the *Lewis Case,* counsel say: "We do not take issue with the holding of this Court in the *Lewis Case* and admit that this five per cent payment was not required by the City in the exercise of its governmental authority and hence was not a *tax* in the literal and primary meaning of that word; but we aver that though it is compensation required by the City to be paid for the use of its streets, etc., i. e., a rental payment or payment in the nature of rental, yet it is a 'tax' in the secondary meaning of said word and as said word is colloquially used and has been frequently used not only by laymen and lawyers but in statutes (including the one in question), ordinances and sometimes in judicial decisions." We have attempted to respond to the urged implication of this insistence.

But, no doubt, appreciating the insufficiency of this contention, reliance appears to be placed, in the second place, on the theory, plausibly advanced, that unless this "secondary" meaning is adopted, this amendment would be meaningless and ineffectual for any

purpose; invoking the general rule that statutes will be construed so as, to quote from counsel's brief, "to effectuate them and avoid their being meaningless or nugatory." Text books and opinions are cited and quoted from in support of this general rule. For example, Section 29 of Endlich on Interpretation of Statutes is quoted: "If possible, a statute must be so construed as to make it effect the purposes for which it was intended." But this and like expressions relied on have application only when "the purposes for which it was intended" are made to appear from language other than that of doubtful meaning which is the subject of construction. This limitation of the rule is expressed in this quotation, made on the brief from *Corn* v. *Fort*, 170 Tenn., 377, 379, 95 S. W. (2d), 620, 627, 106 A. L. R., 647, where the franchise tax act of 1935, Extraordinary Session was involved: "When the intent of a statute is clear general words will be restrained to that intent, and words of narrower import will be expanded to embrace and effectuate that intent. *Gold* v. *Fite*, 61 Tenn. (2 Baxt.), 237; *Brown* v. *Hamlett*, 76 Tenn. (8 Lea), 732." This is but a form of expression of the "fundamental rule of construction of all instruments," including statutes, that the intention shall prevail and that, to this end, "the whole of the instrument will be looked to." *Brown* v. *Hamlett, supra.* But there is no authority for modifying, supplying, enlarging or expanding the meaning of words used in a statute, except when necessary to effectuate an intent otherwise appearing. It is not enough that the draftsman of a statutory enactment had in mind the accomplishment of a certain end, the enactment must itself expressly, or by necessary implication, indicate such an intention; otherwise the legislative power might be employed to effectuate objectives not at all in the contemplation of the legislative

body. The courts are not required to depart from the primary meaning of words, and the statutory context in which they stand to find and apply an intention not otherwise apparent.

The argument here is that the only gross receipts charge in effect in a municipality or county in this State, at the time of the passage of this amendment, was that herein involved, that this act must, therefore, have been intended to apply to this situation.

Conceding this to have been the fact, there is nothing on the face of this amendment to indicate that this special contract was in the contemplation of the Legislature. On the contrary, the provision was a part of a general revenue act, and was definitely so worded as to have Statewide application. Not only was it not restricted on its face to this particular municipality, but it expressly included *any* "County," as well as *any* municipality in Tennessee. It is a general rule that "a statute which relates to persons or things as a class, is a general law, while a statute which relates to particular persons or things of a class is special." *Wheeler* v. *Philadelphia*, 77 Pa., 338. A general law is one "neither for one or more particular persons, nor to operate exclusively in particular part or parts of a state." 2 Bouv. Law Dict., Rawle's Third Revision, p. 3133. The argument that this amendment was directed to this particular contract disregards the essential distinction between general and special laws. It would convert a provision of what is here manifestly a general revenue law into a special law.

Holding to this view, we do not find it necessary to pass on the constitutionality of this amendment, if held to apply to this contract, because of either the alleged insufficiency for such a purpose of the title, or the abrogation, in the exercise of governmental power only, of a

contract, but it may well be argued that the placing of this enactment under general caption and as an amendment to a section devoted to privilege taxes generally on utilities of this class, is neither consistent with an intention to effect this special result, nor within the one subject requirement of the Constitution.

However, giving recognition to the pronounced distinction between general and special statutes, if it should be held that this particular provision was aimed solely at the revenue of this municipality, we would have here a special law under a caption distinctly general, and its constitutionality would be subject to plausible attack as violative of Section 17, Article 2, of the Constitution.

■ In more than one case this court has recognized that the caption limitations imposed by Section 17, Article 2, have application to general revenue acts, holding that legislation enacted under this caption must be confined to this subject. *Knoxville* v. *Lewis,* 80 Tenn. (12 Lea), 180; *Burke* v. *Memphis,* 94 Tenn. 692, 694, 30 S. W. 742; *Memphis* v. *American Express Co.,* 102 Tenn., 336, 342, 52 S. W., 172; *Malone* v. *Williams,* 118 Tenn., 390, 466, 103 S. W., 798, 121 Am. St. Rep., 1002. In the *Burke Case,* where a city privilege tax on architects was involved, the court said: "Municipal taxes are not taxes for state and county purposes, and are not included under the terms of an act to provide state and county revenue."

We have chosen to adopt a construction of the provisions under consideration which, rejecting its application to this contract, saves the constitutionality.

When the clearly general nature of this language is considered, in connection with the repeated use of the phrase "privilege, franchise or license tax" in description of the subject dealt with, terms expressly held by this court not to be properly descriptive of this Nashville

Gas Company contract, and the fact, also, that it occurs in a general revenue bill under a heading so limited, we are unable to conclude that it was the intention of the Legislature to abrogate this obligation. The decree of the chancellor is reversed and the suit dismissed.

GREEN, C. J., McKINNEY, J., and PREWITT, SP. J., concur.

DEHAVEN, J., dissents.

DISSENTING OPINION.

MR. JUSTICE DEHAVEN delivered the following dissenting opinion.

By section 14 of Ordinance 155 of the City of Nashville, known as the "Gas Franchise Ordinance," the Gas Company agreed that in consideration of the rights and licenses therein granted, and in addition to the payment required to be made in section 12 of the ordinance, it would pay "to the Mayor and City Council of Nashville 5% of its gross receipts from the sale of gas, and also from the sale, at a fair market value, of by-products."

Section 31, Chapter 21, Public Acts 1939, which Act amends Chapter 108, Public Acts 1937, as amended by section 19, Chapter 192, Public Acts 1937, provides as follows:

"Any person, firm or corporation engaged in the business of manufacturing gas or of distributing manufactured gas that is now required by municipal ordinance or franchise to pay a gross receipts, privilege, franchise or license tax to any municipality or county in Tennessee shall not be entitled to said reduction of one and one-half (1½%) per cent but shall be required to pay an amount equal to three (3%) per cent of the gross receipts

derived from intrastate business in this State, and by reason of said requirement any such person, firm or corporation shall be and is hereby relieved from paying any such gross receipts, privilege, franchise or license tax to any municipality or county in Tennessee.''

The contention of the City is, in effect, that the payment to the City by the Gas Company of 5% of its gross receipts, as provided for in section 14 of the City Ordinance 155, is not a gross receipts "tax" and, for this reason, the Gas Company is not relieved from the payment of the same by section 31, Chapter 21, Public Acts 1939, copied above.

Technically, the contention that the Gas Company's agreement to pay to the City 5% of its gross receipts was not in its nature a "tax," but was one of the conditions which the City attached to the grant of the franchise and was not imposed by the City in its governmental capacity as a tax, but rested in contract. *Lewis* v. *Nashville Gas & Heating Co.*, 162 Tenn., 268, 280, 40 S. W. (2d), 409.

Municipalities, or counties, in Tennessee, are and have been without legislative authority to levy a gross receipts tax. To construe the word "tax" as used in the amendment contained in section 31, Chapter 21, Public Acts 1939, as meaning a tax in its technical sense would destroy the amendment, because there was not in existence a class on which the amendment could operate; and would never be, unless the Legislature thereafter authorized municipalities or counties to levy such a tax. The Legislature knew when it enacted the amendment municipalities and counties were without power to levy a gross receipts tax; hence it knew that no such tax existed.

A statute is always to be construed so as to avoid showing the perpetration of an absurdity by the Legislature. *Riggins* v. *Tyler*, 134 Tenn., 577, 184 S. W., 860. The

presumption against absurdity is a powerful guide in the construction of statutes. *Wise* v. *Morgan*, 101 Tenn., 273, 48 S. W., 971, 44 L. R. A., 548. If, as held in the majority opinion, the word "tax" is to be accorded its usual and popular meaning, then the Legislature accomplished nothing by the amendment, and its enactment was a vain and useless thing.

It is a familiar rule that it is the duty of the court to ascertain and give effect to the legislative intent, and the real intention will always prevail over the literal sense of terms. In *Rose* v. *Wortham*, 95 Tenn., 505, 509, 32 S. W., 458, 459, 30 L. R. A., 609, the court quoted Mr. Kent as follows:

"In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reasons and intention will prevail over the strict letter."

What was the intention of the Legislature in the enactment of the amendment here in question? It was, I think, to relieve any manufacturer or distributor of gas from the obligation imposed by ordinance or franchise to pay to a municipality or county any part of its gross receipts derived from intrastate business in this State, and to pay to the State 3% of gross receipts thereon. This contention preserves the amendment, frees it from absurdity, and is in accord with the manifest intent and purpose of the Legislature in its enactment.

That the Legislature did not employ the word "tax" in its usual sense is emphasized by the language "now required by municipal ordinance or franchise to pay," etc.

A tax cannot, of course, be imposed by "franchise." But a franchise agreement may, as in the instant case, create an obligation to pay to the municipality a percent-

age on gross receipts. The purpose of the amendment was to relieve gas companies from such obligation.

The State as against the City had a perfect legal right to relieve the gas company from the franchise obligation to pay 5% of its gross receipts. In *Lewis* v. *Nashville Gas & Heating Co., supra,* 162 Tenn., at page 283, 40 S. W. (2d), 409, it was said that the State might have abrogated the contract embodied in section 14 of Ordinance 155. If it could abrogate the whole of the contract, it follows that it could abrogate, as against the City, any of the provisions of the franchise contract.

In my opinion the decree of the chancellor should be affirmed.